# IN THE UNITED STATES DISTRICT COURT
## WESTERN DIVISION OF MISSOURI
## SOUTHWESTERN DIVISION

|  |  |  |
|---|---|---|
| TRI STATE HDWE. INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06-5020-CV-SW-FJG |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN DEERE COMPANY, | ) | |
| A Division of John Deere & Company | ) | |
| | ) | |
| Defendant. | ) | |

## SUGGESTIONS IN SUPPORT OF JOHN DEERE'S
## MOTION FOR SUMMARY JUDGMENT

LATHROP & GAGE, L.C.

By:     /s/ David T. M. Powell
        Timothy K. McNamara  MO #28953
        tmcnamara@lathropgage.com
        David T.M. Powell       MO #43878
        dpowell@lathropgage.com
        J. Alison Auxter        MO #59079
        aauxter@lathropgage.com
        2345 Grand Blvd., Suite 2800
        Kansas City, MO  64108
        (816) 292-2000 / Fax: (816) 292-2001
        ATTORNEYS FOR DEFENDANT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................iii

I.   UNDISPUTED FACTS ...............................................................................iii

    A.   The Parties ........................................................................................iii

    B.   John Deere's Low Performing Dealer Process ............................................v

    C.   Tri-State's Inadequate performance .........................................................vi

    D.   John Deere's Equipment Delivery ..........................................................ix

    E.   Tri-State's Efforts to Find a Buyer for the Dealership ................................x

II.  ARGUMENT................................................................................................1

    A.   Standard for Summary Judgment ..............................................................1

    B.   John Deere Had Good Cause to Terminate Plaintiff's Dealership
        Under Mo. Rev. Stat. § 407.840 ..........................................................2

        1.   John Deere's Low Performing Dealer Market Share Goals
            Are Essential and Reasonable ..........................................................3

        2.   Tri-State Consistently Failed to Meet Its Low Performing
            Dealer Market Penetration Targets ..................................................5

        3.   Tri-State Cannot Show Similarly Situated Dealers Were
            Treated Differently ........................................................................6

    C.   John Deere Fulfilled its Obligations under the Agreement by
        Supplying Tri-State With Equipment When Available, and in
        Good Faith. ........................................................................................8

    D.   John Deere Did Not Tortiously Interfere With Plaintiff's Business
        Expectancy in the Dealership. ..............................................................11

        1.   Plaintiff Had No Valid Business Expectancy in the Sale of
            the Dealership. ............................................................................11

        2.   John Deere Also Had a Legal Right and/or Justification to
            Approve or Not Approve the Sale of the Dealership Per the
            Terms of the Agreement ................................................................12

III. CONCLUSION...........................................................................................14

CC 1931432v1

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................1

*Budach Implement, Inc. v. CNH America LLC*, 2007 WL 2310066
(D.Minn. Aug. 7, 2007) ...............................................................................3, 4, 5, 7, 8

*Caudill v. Farmland Indus.*, 698 F.Supp. 1476 (W.D. Mo. 1988), *aff'd*,
919 F.2d 83 (8th Cir. 1990) .............................................................................................2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................1

*Counts v. MK-Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988) ...........................................1

*Hanrahan v. Nashua Corp.*, 752 S.W.2d 878 (Mo.Ct.App. 1988) ...................................13

*Herring v. Canada Life Assur. Co.*, 207 F.3d 1026 (8th Cir. 2000) ..............................1, 2

*Hunt Enterprises, Inc. v. John Deere Industrial Equipment Company*, 18
F.Supp.2d 697 (W.D.Ky. 1997)....................................................................................12

*J.I. Case v. Early's, Inc.*, 721 F. Supp. 1082 (E.D.Mo. 1989).......................................3, 5

*John Deere Plow Company of St. Louis v. McLeod*, 132 F.Supp. 373
(D.S.C. 1955) ....................................................................................................9, 10, 11

*Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998) ..............................................................1, 2

*Massey v. Tandy Corporation*, 987 F.2d 1307 (8th Cir. 1993) .......................................11

**Statutes**

Mo. Rev. Stat. § 407.840 .......................................................................................iii, 2, 14

Mo.Rev.Stat. 407.307.2 ....................................................................................................12

**Rules**

Fed. R. Civ. P. 56...............................................................................................................1

CC 1931432v1

## INTRODUCTION

Plaintiff Tri-State Hardware Inc. ("Tri-State) fails on all three of its counts against John Deere Company ("John Deere") because Plaintiff cannot prove that John Deere acted improperly in its business relations with Plaintiff. Plaintiff fails on Count I for wrongful termination because Plaintiff has no evidence that John Deere did not have good cause to terminate Plaintiff's dealership under Mo. Rev. Stat. § 407.840. Plaintiff fails on Count II for breach of contract because John Deere fulfilled its obligations under the Agreement, which anticipates and expressly excuses delays or cancellations caused by, among other things, demand exceeding supply. Finally, Plaintiff fails on Count III for interference with a business expectancy because Plaintiff has no evidence indicating that it had a valid business expectancy in the form of a bona fide buyer for the dealership, or that John Deere acted without justification in response to Plaintiff's unsuccessful attempts to find a buyer for the dealership.

## I.  UNDISPUTED FACTS

### A.  The Parties

1.  John Deere Company is an international manufacturer of farm equipment. In the United States, John Deere is subdivided into six different branches, one of which is centered in Kansas City. The Kansas City Branch is further subdivided into three different Divisions, and each Division is divided into various Territories. Affidavit of Wally Phillips (Phillips Aff.) at ¶ 2, filed as Exhibit 1.

2.  Tri-State Hardware, Inc. was located in South West City, Missouri and had served as a John Deere dealer for decades. Tri-State's non-exclusive trade territory, known as its Area of Responsibility ("AOR") included nearly all of MacDonald County,

where Tri-State was based and portions of several surrounding counties. Phillips Aff. at ¶ 3.

3.     A dealership's AOR includes the geographical area for which the dealership is the closest John Deere dealer.  In other words, for John Deere customers in Tri-State's AOR, Tri-State was the closest John Deere dealer. Phillips Aff. at ¶ 4.

4.     The parties signed the current John Deere Agricultural Dealer Agreement on October 7, 1985 (the "Agreement"). Phillips Aff. at ¶ 5 (John Deere Agricultural Dealer Agreement signed by Tri-State on October 7, 1985, Exhibit A to Phillips Aff. (separately filed as "Ex. 1.A"). [For the court's convenience exhibits to the Phillips Affidavit, which is Exhibit 1, will be separately filed and identified by their exhibit letter.]

5.     Section 1(a) of the Agreement provides that

> The Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Company's Conditions of Sale.  Even though an order has been accepted, the Company has the right to refuse to ship Goods and shall have no liability to the Dealer for such refusal or for any delay or other failure to ship or deliver Goods as provided in the Conditions of Sale or Section 4 hereof.

*See* Phillips Aff. at ¶ 6 (quoting language) and Ex. 1.A at § 1(a).

6.     Section 1(d) of the Agreement provides that, "The Dealer agrees to use his best efforts to promote, sell and service Goods.  The Dealer further agrees to achieve sales objectives and marketing penetration within Dealer's Area of Responsibility satisfactory to the Company." Phillips Aff. At ¶ 7, and see, Ex 1.A at §1(d).

7.     The Agreement provided that it could not be assigned without the written consent of John Deere and the company could terminate the Agreement immediately if a

CC 1931432v1

substantial change in ownership occurred without Deere's prior written consent. Phillips Aff. at ¶ 8, and see, Agreement, Ex. 1.A, at §§ 2(c) and 14.

8.     The Agreement also incorporates by reference the John Deere Agricultural Dealer Conditions of Sale, copies of which were sent to Tri-State at various times over the course of its dealership ("Conditions of Sale"). Phillips Aff. At ¶ 9 and Ex. 1.B (John Deere Agricultural Dealer Conditions of Sale dated November 1, 1985).

9.     Section 1 of the Conditions of Sale provides:

> The Company may refuse to sell or ship Goods and shall have no liability to the Dealer for delays in shipment or if it fails to sell, ship or deliver any Goods to the Dealer:
> (a) For any causes beyond the Company's control;
> (b) If the demand for Goods exceeds the available supply;
> (c) If the Dealer's appointment has expired without the execution of a new Authorized Agricultural Dealer Agreement or has been cancelled;
> or if the Company believes in good faith that:
> (d) The Dealer's financial condition does not justify the extension of additional credit;
> (e) The Dealer has consistently failed to perform his obligations under his Authorized Agricultural Dealer Agreement;
> (f) The Dealer's unsold inventory of such Goods would be excessive;
> (g) Shipment would result in larger total dealer inventories of such Goods than the Company is willing to finance.

*See* Phillips Aff. at 10 (quoting language) and Ex. 1.B at §1.

**B.     John Deere's Low Performing Dealer Process**

10.     John Deere dealer performance is measured by the percentage of sales a dealer makes in its AOR as compared to the total industry sales made in that AOR. Phillips Aff. at ¶ 11.

11.     Using a percentage of sales yardstick, rather than units sold or dollars earned, provides a uniform management system that is, nevertheless, tailored to the relative industry potential of a given dealer's AOR.  Thus, under John Deere's system a

v

dealer who achieves a 50% market share in a small AOR selling mostly small sized tractors is considered by John Deere to be just as successful as a dealer who achieves a 50% market share in a large AOR selling large tractors, even though the total number of units sold and dollars received may be significantly different. Phillips Aff. at ¶ 12.

12.     John Deere also uses a uniform system nationwide for identifying low performing dealers, setting goals, and monitoring their performance. Phillips Aff. at ¶ 13.

13.     Each year John Deere identifies the dealers whose market share is five percentage points below the average for their respective division. Using a list sorted high to low by market share, John Deere identifies the dealerships on the bottom of that list and places them in the low performing dealer program. Phillips Aff. at ¶ 14.

14.     Using the dealer's performance as a baseline, John Deere then sets an individualized minimum market share goal for the dealer to meet. Phillips Aff. at ¶ 15.

15.     Low performing dealers receiving letters alerting them that their market share is not satisfactory and informing them of the minimum market share goal. Phillips Aff. at ¶ 16.

16.     If a dealer fails to satisfy John Deere's requirements for two years, the dealer is considered for termination and is notified that it may be terminated if the market share goal is not achieved in the final year of the low performing dealer process. Phillips Aff. at ¶17.

**C.      Tri-State's Inadequate performance**

17.     John Deere put Tri-State into the low performing dealer program and sent the standard first-year notice letter in 2002 informing Tri-State that its performance (for 2001) was below the Territory and Division levels. John Deere's March 26, 2002 letter

set a minimum market share expectation of 33.3%. Phillips Aff. at ¶ 18 and March 26, 2002 Letter (filed as Ex. 1.C).

18.     John Deere sent a second-year warning letter in 2003 indicating that it expected Tri-State to achieve a minimum market share of 36.3%. That letter noted that Tri-State's 2002 market share was 18.2%, well short of Deere's expected market share of 33.3%. Phillips Aff. at ¶ 19 and January 7, 2003 Letter (filed as Ex. 1.D).

19.     John Deere sent a third and final notice letter in 2004 indicating that it expected Tri-State to achieve a minimum 39.3% market share. It noted that Tri-State had failed to meet John Deere's expectations for the previous year and had only posted a 23.1% market share. Phillips Aff. at ¶ 20 and January 15, 2004 "3rd Year Letter" (filed as Ex. 1.E).

20.     John Deere finally informed Tri-State that it was terminated by letter on January 3, 2005. That letter noted that Tri-State had only achieved a market share of 14.9% for 2004, again falling well short of John Deere's minimum expectations. In addition, the letter showed that Tri-State's performance was well below John Deere's expectations, the Territory average and the Division average for 2002, 2003 and 2004. Phillips Aff. at ¶ 21 and January 3, 2005 Letter (filed as Ex. 1.F).

CC 1931432v1

21.     The chart below is drawn from the statistics in John Deere's letter to Tri-State and shows the difference between Tri-State's performance, John Deere's minimum expectations, the Territory average and Division average over the same three-year period. It also shows the declining trend line for Tri-State's performance over those three years.



Phillips Aff. at ¶ 22.

22.     John Deere has produced market share data covering Tri-State and the other John Deere agricultural dealerships in Missouri, Kansas, Arkansas and Oklahoma within 150 miles of South West City.  At the time of its termination, Tri-State was the lowest performing dealer of all John Deere dealers within a 150 mile radius.  Phillips Aff. at ¶23.

CC 1931432v1

## D. John Deere's Equipment Delivery

23. John Deere never cancelled an order that Tri-State had made for a goods or part sale for which Tri-State had a retail customer. Phillips Aff. At ¶ 24.

24. John Deere did experience delays in providing several models of equipment, particularly the 5003 series tractor, due to high demand. These delays were due to demand exceeding supply and Deere's need to allocate limited units to first fulfill customer sales contracts and then distribute unsold, showroom units to its dealers. Phillips Aff. At ¶ 25 .

25. Tri-State's corporate representative testified that no customer orders were cancelled after John Deere decided to terminate Plaintiff's dealership:

Q: But there were no customer orders that were cancelled; is that correct?
A: We didn't – let's see.  No.

See Deposition of Tri-State Corporate Representative (Deborah Denny)(filed as Ex. 2) at 253:14-16.

26. Tri-State's corporate representative testified that, at Plaintiff's request, John Deere shipped particular stock orders after John Deere notified Plaintiff that it was being terminated:

Q: So what happened in response to Mr. Wolfe's letter, Exhibit 36? Were some of those orders not cancelled?
A: The ones for – the ones we told him about we told him not to cancel them.
Q: And John Deere honored those orders?
A: Yes, they did.

See Denny Depo., Ex. 2, at 258:13-19.

**E.     Tri-State's Efforts to Find a Buyer for the Dealership**

27.    Plaintiff never made a formal offer to sell the Dealership and/or its stock of merchandise.  See Plaintiff's Responses to Defendant's First Request for Admissions at ¶ 6 (filed as Ex. 3).

28.    Plaintiff never received a formal offer from anyone wishing to purchase the Dealership and/or its stock of merchandise.  Id. at ¶ 11.

29.    Judy Wolfe testified that no documentation was ever received by Plaintiff regarding any of the Buyers' interest in purchasing the Dealership:

> Q: Did any of these individuals who expressed an interest ever give you a letter of intent or some documentation expressing their interest?
> A: No.  It never got that far.  And we didn't ask for one.

See J. Wolfe Deposition (filed as Ex. 4) at 60:21-61:1.

30.    Plaintiff did not provide John Deere with documentation relating to any of the potential buyers of the Dealership:

> Q: Other than, it sounds like, telephone conversations providing the name of an individual who expressed interest in buying the dealership, did Tri-State provide any other information about these buyers to John Deere:
> A: Just, you know, Ben would ask questions, and Charles would answer them concerning, you know, are they financially stable or something like that.  Are they somebody that you think could financially handle and –
> Q: But Tri-State didn't provide any documentation about the potential buyer or any records or anything like that?
> A: No.

See D. Denny Deposition, Ex. 2.,  at 236:25-237:14.

x

31.     John Deere met with DeWayne Craig about purchasing the Dealership. Craig was interested in the purchase only by financing nearly 100% of the value of the dealership.  John Deere informed Craig that low equity dealerships often fail, so John Deere requires 25% equity for new dealers.  Craig indicated that he could not meet this requirement.  Phillips Aff. At ¶ 26.

CC 1931432v1

## II.     ARGUMENT

### A.     Standard for Summary Judgment

Summary judgment should be granted to the moving party if the pleadings, depositions and affidavits demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Where, as here, the party moving for summary judgment does not bear the burden of proof at trial, that party must merely show "there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.  Once the moving party makes the necessary showing, the burden shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material fact issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In order for Plaintiff to overcome John Deere's motion for summary judgment, it must carry the "burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment *should be granted*."  *Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (emphasis added); *see also Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  A fact is "material" only if disputes over that fact "might affect the outcome of the lawsuit according to applicable law."  *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (citing *Anderson*, 477 U.S. at 248).  A dispute about a material fact is "genuine"

1

only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Herring*, 207 F.3d at 1029; *Liebe*, 157 F.3d at 578. Furthermore, summary judgment is proper when there is no genuine issue of material fact "because it avoids needless and costly litigation and promotes judicial efficiency." *Caudill v. Farmland Indus.*, 698 F.Supp. 1476, 1477-78 (W.D. Mo. 1988), *aff'd*, 919 F.2d 83 (8th Cir. 1990).

**B.    John Deere Had Good Cause to Terminate Plaintiff's Dealership Under Mo. Rev. Stat. § 407.840**

John Deere terminated Plaintiff's dealership for good cause, specifically, its failure to achieve the minimum required market share as required by the Agreement and its decline of market share in its area of responsibility. Under Mo. Rev. Stat. § 407.840, John Deere may terminate a farm equipment dealership for good cause:

> Good cause means failure by a farm equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement if such requirements are not different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

Mo. Rev. Stat. § 407.840. The main provision at issue here is subsection eight, which provides:

> **In addition**, good cause shall exist whenever:…
>
> (8) The farm equipment dealer has consistently failed to meet the manufacturer's requirements for reasonable market penetration based on the manufacturer's experience in other comparable marketing areas.

Mo. Rev. Stat. § 407.840(8) (emphasis added). Plaintiff had an obligation to achieve a certain market share in its AOR under the Agreement:

> The Dealer further agrees to achieve sales objectives and market penetration within Dealer's Area of Responsibility satisfactory to the Company. . . .

2

*See* Agreement, <u>Ex. 1.A</u>, at §1(d).

> **1.     John Deere's Low Performing Dealer Market Share Goals Are Essential and Reasonable**

The only case to construe expressly the "essential and reasonable" language of the Missouri Farm Implement Dealer Act is *J.I. Case v. Early's, Inc.*, 721 F. Supp. 1082 (E.D.Mo. 1989). In *J.I. Case*, the dealer was terminated for failing to comply with a requirement to install a computer which could communicate directly with the manufacturer. There, the court accepted the unopposed argument that the computer system was an "essential requirement" because it was "essential for efficient and effective communication between dealers and the manufacturer and between the dealers." *Id.* at 1085. *J.I. Case* recognizes that the term "essential requirement" looks to business necessity.

A recent decision from the District of Minnesota construed nearly identical language in the Minnesota Agricultural Equipment Dealership Act and, by extension, the Iowa Equipment Dealership Act. In *Budach Implement, Inc. v. CNH America LLC*, 2007 WL 2310066 (D.Minn. Aug. 7, 2007), CNH, an agricultural equipment manufacturer, moved for summary judgment under the Minnesota and Iowa acts. CNH had terminated the dealer, Budach Implement, because it failed to maintain required inventory levels that were triggered when the dealer failed to capture 90% of CNH's state-market share in the dealer's territory for each market share-measured unit. The district court granted summary judgment in favor of the manufacturer.

In so doing, the district court concluded that the inventory requirement met the statutory language that it be "essential and reasonable." The court found that the formula CNH used to set the inventory requirement was fair because it was based "not merely on

3

CNH's state-wide market penetration, but on the historical sales figures in the dealer's own territory." *Id.* at *5. Moreover, the district court found that the requirement was "actually quite generous" because it required the dealer to carry an inventory only half the size of what would normally be expected. *Id.* at *6.

In *Budach Implement*, the dealer complained that the requirement was unreasonable because <u>it could not achieve it</u>. The district court understood the manufacturer's point: "[the dealer] simply did not have the financial wherewithal to maintain appropriate inventory, which in turn, made it difficult for [the dealer] to sell the manufacturer's] products." *Id.* But the district court held that the Minnesota Farm Equipment Dealership Act, "does not invalidate otherwise essential and reasonable terms of a dealership agreement <u>on the basis that a particular dealer cannot meet them</u>." *Id.* (emphasis added). The necessity for this ruling was clear to the court, "If that were the case, the [Act] would never allow the termination of a dealer." *Id.*

The same is true here. John Deere measures market share goals in the same manner for John Deere dealerships nationwide. *See*, Statement of Facts ("SOF") at ¶¶ 10 and 12. John Deere dealer performance is measured by the percentage of sales by a dealer in its AOR as compared to the total industry sales in that AOR. *Id.*, at ¶ 10. Using a percentage of sales yardstick rather than units sold or dollars earned provides a uniform management system that is, nevertheless, tailored to the relative industry potential of a given dealer's AOR. Thus, under John Deere's system a dealer who achieves a 50% market share in a small AOR selling mostly small sized tractors is considered by John Deere to be just as successful as a dealer who achieves a 50% market share in a large AOR selling large tractors, even though the total number of units sold and dollars

received may be significantly different. *Id.*, at ¶ 11. In this way, the system fairly judges both small and large dealers regardless of their geographic location.

John Deere put Tri-State into the low performing dealer program and notified Tri-State in 2002, 2003 and 2004 that it needed to meet its market share goals. *Id.*, at ¶¶ 17-19. Like the inventory requirement in *Budach Implement*, John Deere's system is based "not merely on [John Deere's] state-wide market penetration, but on the historical sales figures in the dealer's own territory" and it is "quite generous." *Budach Implement*, 2007 WL 2310066 at *5, *6. All of these market share goals were more than seven percentage points below the territory average—the average market share of John Deere dealers in plaintiff's area—and 25 percentage points below the average for the Division. If John Deere's system for managing low performing dealers is not essential and reasonable, then the Act "would never allow termination of a dealer." *Id.* at *6.

### 2. Tri-State Consistently Failed to Meet Its Low Performing Dealer Market Penetration Targets

Like the dealerships in *J.I. Case* and *Budach Implement*, Tri-State has consistently failed to meet John Deere's essential and reasonable requirements. Plaintiff's actual market share fell significantly below its target market share in fiscal years 2002, 2003, and 2004. SOF at ¶ 21. In 2002, 2003, and 2004, John Deere put Plaintiff on notice that its market share was not acceptable and must be improved. *Id.* at ¶¶ 17-20. In these letters, John Deere indicated that if Plaintiff was not able to achieve its minimum market share goals established as part of the low performing dealer program, John Deere reserved the right to terminate Plaintiff's appointment as a John Deere dealer per the terms of the Agreement. *See*, Ex. 1.E. The market share targets discussed above are assigned to every John Deere dealership. SOF. at ¶ 12. Plaintiff's minimum market share

5

targets were at least seven percentage points below the territory averages in Plaintiff's territory for the years 2001-2004, and Plaintiff's *actual* market share was over 20% less than the territory average in those years. *Id*. at ¶ 21.



*See* SOF at ¶ 21. For three years John Deere notified and attempted to work with Plaintiff regarding its substandard and declining market share, yet Plaintiff consistently failed to come even close to achieving its market share targets. In 2004, Plaintiff was the lowest performing dealer in its territory, and was the lowest performing dealer within a 150 mile radius of the dealership. *Id*. at ¶ 22.

### 3. Tri-State Cannot Show Similarly Situated Dealers Were Treated Differently

When a manufacturer's requirements are essential and reasonable and the dealer has consistently failed to meet them—as is the case here—there is only one other argument for the dealer to make. The statute states that the manufacturer's requirements

6

"must not [be] different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement." Mo.Rev.Stat. §407.840. Thus, the failing dealer's last argument is the lament that others had the same problem but they did not get into trouble.

The *Budach Implement* court addressed this issue head on, because the Minnesota statute—like Missouri's—indicates that a manufacturer's requirements will support a good cause termination, "if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms." *Budach Implement*, 2007 WL 2310066, at *5. The court held that it was plaintiff's burden to show a difference in treatment, and they had failed to do so. Thus,"[t]o establish that a dealer was *similarly situated* to it," the district court held that, "[the dealer] needs to submit evidence that the dealer [1] fell similarly short of the [manufacturer's] requirement and [2] did so for a similar length of time, [3] despite a similar series of warnings." *Id.* at *7.

In *Budach Implement*, the dealer offered letters from the manufacturer to a few other dealers indicating that their sales and inventory levels were inadequate. The court held that this was not sufficient evidence to avoid summary judgment. The court found that the letters did not reveal the status of these other dealers. The court pointed out that a letter to address a minor one-year failure would not be similar to the serious, multi-year failure of Budach Implement. The district court held that, "[w]ithout evidence that a single similarly situate dealer was treated differently, Budach Implement's MAEDA claim cannot survive summary judgment." *Id.*

The same result holds true here. At the time of its termination, Tri-State was the lowest performing dealer in its territory and for a 150 mile radius. As a matter of law,

7

there were no dealers similar to plaintiff because none matched it's poor performance <u>and</u> failure to improve. Moreover, Tri-State cannot prove any damages for this count because the testimony of its expert should be excluded for the reasons stated in Deere's Motion to Exclude Designation and Testimony of Plaintiff's Expert, which is incorporated by reference. Accordingly, as in *Budach Implement* case, this Court should enter summary judgment on Count I of Plaintiff's Complaint.

**C.     John Deere Fulfilled its Obligations under the Agreement by Supplying Tri-State With Equipment When Available, and in Good Faith.**

Count II is a breach of contract claim. Plaintiff claims that John Deere breached the Agreement "by failing to timely supply [it] with merchandise, delivering inventory after the growing season had ended and by canceling orders placed by plaintiff." *See* Petition at ¶ 11. John Deere is entitled to summary judgment on this count because plaintiff has no evidence that any delayed or canceled orders violated the Agreement.

This claim turns upon terms of the Agreement which, in turn, incorporates the Conditions of Sale. Section 1 of the Agreement states:

> The Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Company's Conditions of Sale. Even though an order has been accepted, the Company has the right to refuse to ship Goods and shall have no liability to the Dealer for such refusal or for any delay or other failure to ship or deliver Goods as provided in the Conditions of Sale or Section 4 hereof.

See <u>Ex. 1.A</u> at § 1(a). Section 1 of the Conditions of Sale, "Conditions Affecting Delivery," provides:

> The Company may refuse to sell or ship Goods and shall have no liability to the Dealer for delays in shipment or if it fails to sell, ship or deliver any Goods to the Dealer:
>     (a) For any causes beyond the Company's control;
>     (b) If the demand for Goods exceeds the available supply;

(c) If the Dealer's appointment has expired without the execution of a new Authorized Agricultural Dealer Agreement or has been cancelled;
or if the Company believes in good faith that:
(d) The Dealer's financial condition does not justify the extension of additional credit;
(e) The Dealer has consistently failed to perform his obligations under his Authorized Agricultural Dealer Agreement;
(f) The Dealer's unsold inventory of such Goods would be excessive;
(g) Shipment would result in larger total dealer inventories of such Goods than the Company is willing to finance.

*See* Conditions of Sale, Ex. 1.B, at § 1. Provisions of this type have been in John Deere agreements for over half a century.

This exact issue was litigated in *John Deere Plow Company of St. Louis v. McLeod*, 132 F.Supp. 373 (D.S.C. 1955). There, John Deere terminated a dealer and sought to foreclose on a lien. The dealer counterclaimed, among other things, for breach of contract arguing that John Deer had breached its contract "by failing to sell to him goods ordered by him while selling the same goods to other dealers." *Id.* at 375. The dealer agreement then in force contained the same kinds of limitations found today in Section 1 of the Conditions of Sale. McLeod's agreement provided:

11. Contingencies affecting delivery. The Company shall be under no liability to the Dealer if it delays shipment or fails to sell, ship or deliver any good to the Dealer if such delay or failure is due to fire or other elements, war, riot, strikes, labor disturbances, transportation difficulties, the decree or order of any court or government, inability of the Company to obtain the goods, or any cause beyond the Company's control. If the demand from all sources exceeds the Company's available supply the quantity of goods to be allotted to the Dealer shall be determined solely by the Company, in which event the Company shall not be liable for having failed to furnish the Dealer with all or any of the goods ordered by him.

9

*Id.* at 376 (emphasis added). Reading this language, the district court concluded, "it is clear that failure to deliver goods for any of the reasons enumeraed [sic] above would not constitute a violation of the contract." *Id.*

Thus, the *McLeod* court concluded that, "in order to establish a breach of contract it is not sufficient for the [dealer] to merely aver or show that goods ordered by him were not delivered." *Id.* Rather, the dealer, "must further allege and prove that [1] the goods were available and [2] they could have been delivered and [3] that [John Deere] failed to make delivery, [4] not for any of the reasons enumerated in the foregoing clause, but [5] in direct violation of its contract obligation." *Id.*

In *McLeod*, the dealer failed to meet this burden. The court found that, "goods were, without exception, delivered to the [dealer] whenever available." *Id.* The Court concluded that, "in no instance did [John Deere] fail to deliver goods except when they were not available or were in short supply for on [sic] of the reasons enumerated in the clause set out above." *Id.* Because the dealer failed to present a material issue of fact, the district court granted summary judgment.

This Court should reach the same result here. Tri-State can make no showing that John Deere failed to deliver goods except when they were not available, in short supply, or were allocated by John Deere pursuant to its rights under the Agreement. For instance, Deere is entitled to cancel orders, "which the Company contemplates will be shipped after the cancellation or the effective date of the termination of the dealer's appointment." *See* Agreement at § 4. Indeed, plaintiff's corporate representative acknowledged that delays for a new product —the 5003 Tractor—occurred because the demand outran the supply. *See*, <u>Ex. 2</u>, Denny Depo. at 265:21-266:8. Ms. Denny on behalf of Tri-State also

10

acknowledged that Deere made items available for which Tri-State had ready buyers. *Id*. at 258:13-19. Thus, like the dealer in *McLeod*, Tri-State cannot prove that: 1) the goods were available, 2) they could have been delivered and 3) that John Deere failed to make delivery, 4) not for any of the reasons enumerated in the foregoing clause, but 5) in direct violation of its contract obligation. *McLeod*, 132 F.Supp. at 376. Accordingly, the Court should grant summary judgment in favor of John Deere and dismiss Count II.

**D.   John Deere Did Not Tortiously Interfere With Plaintiff's Business Expectancy in the Dealership.**

Count III alleges that John Deere tortiously interfered with Tri-State's efforts to sell the dealership to a new owner.

In order to recover for tortious interference with a business expectancy, Plaintiff must prove five elements:

> (1) a contract or a valid business expectancy;
> (2) defendant's knowledge of the contract or relationship;
> (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship;
> (4) absence of justification; and
> (5) damages resulting from defendant's conduct.

*Massey v. Tandy Corporation*, 987 F.2d 1307, 1310 (8th Cir. 1993). Because Plaintiff is unable to prove all of the above elements, Plaintiff's Count III for Interference with Business Expectancy must fail.

**1.   Plaintiff Had No Valid Business Expectancy in the Sale of the Dealership.**

In order to have a claim under Count III, Plaintiff must have had a valid business expectation. *Massey*, 987 F.2d at 1310. Plaintiff claims that John Deere refused to approve any of the Buyers for the Dealership proposed by Plaintiff. *See* Petition at ¶ 17. Plaintiff admits, however, that it never made a formal offer to sell the Dealership. *See*

11

SOF at ¶ 27. Without making a formal offer to sell the Dealership, Plaintiff had no valid business expectancy in the sale of the Dealership. Plaintiff also admits that none of the Buyers ever made a formal offer to purchase the Dealership. *See*, *Id.* at ¶ 28. Although Plaintiff claims that the Buyers discussed purchasing the Dealership from Plaintiff, these were *discussions* and not *offers*, and therefore should not be considered valid business expectations. Without a valid business expectation, Plaintiff cannot succeed on its claim for interference with business expectancy against John Deere.[1]

> **2.  John Deere Also Had a Legal Right and/or Justification to Approve or Not Approve the Sale of the Dealership Per the Terms of the Agreement**

Even if Plaintiff had presented a potential buyer to John Deere, John Deere had a contractual right to not approve of the potential buyer. The Agreement provided that it could not be assigned without the written consent of John Deere and Deere could terminate the Agreement immediately if a substantial change in ownership occurred without Deere's prior written consent. *See*, Agreement, <u>Ex. 1.A</u>, at §§ 2(c) and 14.

In *Hunt Enterprises, Inc. v. John Deere Industrial Equipment Company*, 18 F.Supp.2d 697 (W.D.Ky. 1997), a related John Deere company that manufactures industrial equipment moved to dismiss a claim for tortious interference. The plaintiff claimed, among other things, that John Deere Industrial Equipment tortiously interfered with a business expectancy when it refused to consent to a proposed buyer of the dealership. The proposed buyer already owned a dealership for a competing brand in another state. Deere did not consent to the sale. The district court recognized that,

---

[1] Even if Plaintiff had a bona fide buyer for the Dealership, it failed to comply with its statutory duty to request approval of the buyer from John Deere. Mo.Rev.Stat. 407.307.2 "The dealer's request shall include the reasonable financial information, personal background, character references and work histories as required by the manufacturer to render such a determination." *Id.* This information was not provided to John Deere for any of the alleged potential buyers. In addition to having no contractual obligation to approve the sale, without Plaintiff's request John Deere also had no statutory obligation to approve the sale.

CC 1931432v1

"Deere's right to withhold its consent for the sale of Hunt's dealership was bargained for and an essential part of the contract between the parties." *Id.* at 703. Consequently, the court concluded that, "Deere was entitled to withhold its consent <u>even to the detriment of Hunt</u>." *Id.* (emphasis added). Because Deere had the right to withhold consent, the court granted the motion to dismiss, holding that "Hunt's claim must fail since it does not sufficiently plead improper interference by Deere." *Id.*

The same result should obtain here. Assuming that plaintiff had an expectancy in the sale—which it did <u>not</u>—Deere had the right to withhold its consent. DeWayne Craig was the only alleged potential buyer who even went so far as to provide financial information to John Deere. Craig was not suitable as a dealer because he wanted to buy the dealership almost entirely on credit, which did not meet John Deere's new dealer equity requirements. SOF at ¶ 31.

In order to succeed on its claim for interference with a business expectancy, Plaintiff must approve all five elements as discussed above. Because John Deere was justified in its decision not to approve new dealers if they did not meet John Deere requirements, Plaintiff cannot prove the fourth element, absence of justification. "[A]bsence of justification is an essential element of a tortious interference claim." *Hanrahan v. Nashua Corp.*, 752 S.W.2d 878 (Mo.Ct.App. 1988). Because Plaintiff has not alleged and cannot prove that John Deere did <u>not</u> have the legal right to approve or not approve of a potential buyer, Plaintiff fails on its tortious interference claim. *Id.*

John Deere was justified in exercising its rights under the Agreement not to approve the sale of the Dealership. Accordingly, the Court should grant summary judgment in favor of John Deere and dismiss Count III of the Complaint.

CC 1931432v1

### III. CONCLUSION

Plaintiff cannot prove the required elements for any of its claims against John Deere.

- COUNT I: John Deere did not violate Mo. Rev. Stat. § 407.840, because it terminated Plaintiff for good cause. Plaintiff was the lowest-performing dealer for a 150 mile radius, and Plaintiff also failed to meet its low performing dealer market share targets for three consecutive years, after notice by John Deere that it could terminate Tri-State if it failed to meet these targets.

- COUNT II: John Deere did not breach the Agreement by failing to deliver goods to Plaintiff. Tri-State cannot show the John Deere had available goods, that could be delivered, but that were not sent in violation of the terms of the Agreement.

- COUNT II: Plaintiff has admitted that it had no valid business expectancy in the sale of the Dealership. Furthermore, if there had been a bona fid buyer—and there was not—John Deere was contractually justified in withholding its consent to the sale.

For all of these reasons, and those discussed more fully above, John Deere requests that this Court grant summary judgment in favor of John Deere and dismissal three counts in its Petition.

LATHROP & GAGE, L.C.

By:    /s/ David T. M. Powell
      Timothy K. McNamara  MO #28953
      tmcnamara@lathropgage.com
      David T.M. Powell      MO #43878
      dpowell@lathropgage.com
      J. Alison Auxter          MO #59079
      aauxter@lathropgage.com
      2345 Grand Blvd., Suite 2800
      Kansas City, MO  64108
      (816) 292-2000 / Fax: (816) 292-2001
      ATTORNEYS FOR DEFENDANT

CC 1931432v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

Ron Mitchell
M. Lynn Stanley, Jr.
Blanchard, Robertson, Mitchell & Carter, P.C.
320 W. 47th St.
P.O. Box 1626
Joplin, MO 64802

Date: August 24, 2007

/s/ David T. M. Powell
An Attorney for John Deere Company,
a Division of John Deere & Company

16

CC 1931432v1