IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| TRI STATE HDWE. INC. | ) |
| Plaintiff, | ) Case No. 06-5020-CV-S-FJG |
| vs. | ) |
| JOHN DEERE COMPANY, A Division of Deere & Company | ) |
| Defendant. | ) |

## TRIAL BRIEF
## OF DEFENDANT JOHN DEERE COMPANY

Defendant John Deere Company ("Deere") submits the following trial brief on a number of legal issues that will require rulings by the Court in the trial of this case.

### I. The Missouri Farm Implement Dealership Act Claim

Plaintiff's first count is a claim under the Missouri Farm Implement Dealership Act, Mo.Rev.Stat. § 407.010 et seq. The central issue in this case is whether Deere had "good cause" under the statute to terminate Tri-State Hdwe.'s John Deere Agricultural Equipment Dealership Agreement. The statute provides two definitions of good cause:

> Good cause means failure by a farm equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement if such requirements are not different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

Mo. Rev. Stat. § 407.840.

**In addition,** good cause shall exist whenever:...

1

(8) The farm equipment dealer has **consistently failed** to meet the manufacturer's requirements for **reasonable market penetration** based on the manufacturer's experience in other **comparable marketing areas**.

Mo. Rev. Stat. § 407.840(8) (emphasis added).

Reduced to its essence, the statue requires Tri-State Hdwe. to prove one of three theories. First, it can argue that it met John Deere's market share requirements. Second, if it failed John Deere's requirements, it can argue that the requirements were unreasonable. Third, if it failed to meet reasonable requirements, it can argue that John Deere did not apply its requirements uniformly on all dealers.

### A. Tri-State Hdwe. Failed to Meet John Deere's Requirements

The first question is not in doubt. Plaintiff did not meet John Deere's requirements. John Deere evaluates each dealership based upon its ability to make sales in the area of potential customers for whom that dealership is the geographically closest John Deere dealership (its "Area of Responsibility" or "AOR"). Referred to as "market share" this standard is a percentage of the dealership's sales in its Area of Responsibility compared to an industry report of all agricultural equipment sales (of all brands) in that Area of Responsibility.

Dealerships whose market share is five percentage points below the territory average are designated as low performing dealers and targeted for improvement in John Deere's Low Performing Dealer ("LPD") program. The territory average is the average of the market share performance of the handful of John Deere dealers in the same geographic management unit (the John Deere "Territory"). Each low performing dealership is given a specific market share goal for its Area of Responsibility. If a

2

dealership is unable to meet that goal for three consecutive years it is subject to termination.

Tri-State Hdwe. was placed into the Low Performing Dealer Process in 2001. As demonstrated in this chart, it failed to meet its targets for three consecutive years.



In its last full year of operations, Tri-State Hdwe. had the lowest market share—not just of the John Deere dealers in its territory—but of any of the 22 John Deere dealerships within 150 miles of Tri-State Hdwe.'s location.

**B.  Plaintiff Cannot Show that John Deere's Market Share Requirement is Unreasonable**

Failing to achieve its market share goal, Tri-State Hdwe. must argue that the goal itself is flawed. Tri-State Hdwe.'s method here is to argue that dollar sales figures are the only standard by which it should be judged. It will point out that it had better dollar "settlements" than several dealerships during the time that it was in the Low Performing

3

Dealer Process. Plaintiff's position fails to comprehend, let alone acknowledge, the fairness of John Deere's system.

Plaintiff's apparently wishes that the dollar value of sales is the sole, absolute measure. John Deere's percentage system, however, views sales relative to a dealership's potential. An example in the chart below shows the difference. The size of each box is the relative dollar volume of each dealership's sales. In plaintiff's view, the dealers are ranked as named, solely on the base of the dollar volume of their sales:



But John Deere's market share system takes into account the sales potential of each dealership's Area of Responsibility (each rectangle reflects the dollar volume of sales in a dealer's Area of Responsibility and the shaded area represents its percentage share):

4

In this example, John Deere regards all three dealerships as performing equally well. They each are achieving a 33% market share in their individual Areas of Responsibility, even though Dealer 1's AOR potential and its sales dollars are three times the size of Dealer 3's. Dealer 3 could only match the absolute performance of Dealer 1—plaintiff's standard—by achieving 100% market share in its Area of Responsibility. John Deere's system is both fair and accurate because it scales the performance measure—and John Deere's requirements—to the sales potential of a dealership's Area of Responsibility.

Court's routinely recognize that market share averages are an acceptable method of gauging a dealership's performance. A similar approach was approved by the Florida Court of Appeals in *International Harvester Co. v. Calvin*, 353 So.2d 144 (Fla.Ct.App. 1978). There, International Harvester ("IH") sought review of a state agency's decision voiding a dealer termination under Florida's franchise statute. The agency had ruled that IH failed to present sufficient evidence that its dealer had failed to achieve satisfactory market penetration. (By contrast, in this case Tri-State Hdwe. is the plaintiff and bears the burden of proof.) The appellate court reversed, holding that IH's evidence was adequate.

In the *International Harvester* case, IH presented three types of data. First, it established the dealer's market share in each type of equipment. Second, it presented the average market share of all IH's dealers in the region. Third, because the dealer had a "key" market, IH presented the average market share of dealers in similar "key" markets in Florida. The court of appeals upheld the use of average market shares as an appropriate standard and held that IH's decision appropriately considered the dealer's "peculiar market situation." *Id.* at 147, 149. Notably, the court of appeals was unconcerned by the presence of intra brand competition; <u>rather it regarded such</u>

competition as evidence that the dealer had failed to fully exploit his market. Id. *International Harvester* supports Deere's method of using average market share statistics as the measure of dealership performance and it suggests that specific comparisons may be drawn between dealers with comparably sized markets.

The court in *Budach Implement, Inc. v. CNH America LLC*, 2007 WL 2310066 (D.Minn. Aug. 7, 2007), also held that an individualized requirement triggered by a dealership's failure to meet a statewide market share average was reasonable. Indeed, the *Budach Implement* court specifically observed that the Minnesota Farm Equipment Dealership Act, "does not invalidate otherwise essential and reasonable terms of a dealership agreement on the basis that a particular dealer cannot meet them." *Id.* at *6 (emphasis added).

### C. Tri-State Hdwe. Cannot Show That it Was Treated Differently

Tri-State Hdwe.'s final, fall-back theory on this count must be that John Deere's reasonable standard was unfairly applied. The court in *Budach Implement* addressed the question of whether a similarly situated dealer was treated differently. It concluded that, "[t]o establish that a dealer was similarly situated to it, [Tri-State Hdwe.] needs to subject evidence that the dealer [1] fell similarly short of the [John Deere's] requirement and [2] did so for a similar length of time, [3] despite a similar series of warnings." *Id.* at *7. In its last year, Tri-State had the lowest market share of any John Deere dealership for 150 miles in any direction.

### II. Plaintiff Lacks Sufficient Evidence for its Breach of Contract Claim

Tri-State Hdwe.'s second count claims that John Deere breached its dealership agreement with it by failing to provide equipment to sell. Section 1 of Tri-State Hdwe's

6

CC 1950039v1
Case 3:06-cv-05020-FJG   Document 113   Filed 10/31/07   Page 6 of 10

Agricultural Equipment Dealership Agreement incorporates provisions of John Deere's Conditions of Sale (Def. Ex. 8). Section 1 of the Conditions of Sale ("Conditions Affecting Delivery") provides:

> The Company may refuse to sell or ship Goods and shall have no liability to the Dealer for delays in shipment or if it fails to sell, ship or deliver any Goods to the Dealer:
>
> (a) For any causes beyond the Company's control;
>
> (b) If the demand for Goods exceeds the available supply;
>
> (c) If the Dealer's appointment has expired without the execution of a new Authorized Agricultural Dealer Agreement or has been cancelled;
>
> or if the Company believes in good faith that:
>
> (d) The Dealer's financial condition does not justify the extension of additional credit;
>
> (e) The Dealer has consistently failed to perform his obligations under his Authorized Agricultural Dealer Agreement;
>
> (f) The Dealer's unsold inventory of such Goods would be excessive;
>
> (g) Shipment would result in larger total dealer inventories of such Goods than the Company is willing to finance.

Provisions of this type have been in John Deere agreements for over half a century, and expressly address the situation here, where John Deere introduced a new model tractor that was in high demand and short supply.

In a nearly identical case, another federal court set forth the elements of such a claim. Tri-State Hdwe, "must further allege and prove that [1] the goods were available and [2] they could have been delivered and [3] that [John Deere] failed to make delivery, and [4] not for any of the reasons enumerated in the foregoing clause, but [5] in direct

7
CC 1950039v1
Case 3:06-cv-05020-FJG   Document 113   Filed 10/31/07   Page 7 of 10

violation of its contract obligation." *John Deere Plow Company of St. Louis v. McLeod*, 132 F.Supp. 373, 375 (D.S.C. 1955). Tri-State Hdwe. cannot meet this burden.

### III. Tri-State's Tortious Interference Claim Requires Certainty

Tri-State Hdwe's third count is a claim for tortious interference with a business expectancy claiming that John Deere refused to consider the transfer of Tri-State Hdwe's dealership contracts to a new owner. Tri-State must prove: (1) a contract or valid business expectancy; (2) John Deere's knowledge of the relationship; (3) intentional interference by John Deere inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct. *Massey v. Tandy Corp.*, 987 F.2d 1307, 1310 (8th Cir. 1993).

In particularly, Tri-State Hdwe. must prove the alleged business expectancy with certainty. The "mere hope of establishing a business relationship which was tenuous" is not enough. *See, Service Vending Co. v. Wal-Mart Stores, Inc.* 93 S.W.3d 764, 770 (Mo.Ct.App. 2002)(reversing verdict and trial court's denial of judgment notwithstanding the verdict, and quoting *Misichia v. St. John's Mercy Medical Center*, 30 S.W.3d 848 (Mo.Ct.App. 2000). Thus, "it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with." *Id.* (quoting *Gott v. First Midwest Bank of Dexter*, 963 S.W.2d 432, 438 (Mo.Ct.App. 1998). In addition, for Tri-State Hdwe. to prove a business expectancy it must present evidence that it had a certain offer that it was willing to accept. Plaintiff can make no such showing.

Moreover, to request a transfer of its dealership, a farm implement dealership must, under Missouri law, supply the manufacturer with "reasonable financial

8

information, personal background, character references and work histories as required by such manufacturer to render such a determination." Mo.Rev.Stat. §407.307.1 Tri-State Hdwe. did not do this.

Tri-State Hdwe. must also prove that John Deere acted with an improper motive ("absence of justification") in refusing to authorize transfer of the dealership. But under its dealership agreement, "Deere was entitled to withhold its consent even to the detriment of [Tri-State]." *See, Hunt Enterprises, Inc. v. John Deere Industrial Equipment Company*, 18 F.Supp.2d 697, 703 (W.D.Ky. 1997)(construing a similar agreement). The approval of the transfer of a dealership agreement is no different than the grant of a new John Deere Agricultural Equipment Dealership Agreement. In both instances, John Deere is entitled to exercise its business judgment in considering the qualifications of the applicant. John Deere refused to consider individuals (that it knew of) who contacted Tri-State Hdwe about the potential purchase of the dealership, because they lacked unencumbered equity to fund the dealership and they would not agree to open the dealership in a location satisfactory to John Deere. It is Tri-State Hdwe's burden to show that John Deere's position was not justified.

## CONCLUSION

For the foregoing reasons, Defendant John Deere Company submits that plaintiff will be unable to make a submissible case on any of its claims.

9

LATHROP & GAGE, L.C.

By: /s/ David T. M. Powell
Timothy K. McNamara   MO #28953
tmcnamara@lathropgage.com
David T.M. Powell          MO #43878
dpowell@lathropgage.com
2345 Grand Blvd., Suite 2800
Kansas City, MO  64108
(816) 292-2000 / Fax: (816) 292-2001

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

Ron Mitchell
M. Lynn Stanley, Jr.
Blanchard, Robertson, Mitchell & Carter, P.C.
320 W. 47th St.
P.O. Box 1626
Joplin, MO  64802

Date: October 31, 2007

/s/ David T. M. Powell
An Attorney for John Deere Company,
a Division of Deere & Company