IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| TRI STATE HDWE. INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 06-5020-CV-SW-FJG |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN DEERE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Currently pending before the Court is Defendant's Renewed Motion to Exclude the Designation and Testimony of Plaintiff's Expert and for Extension of Time to Designate its Expert Witness (Doc. No. 72) and its Suggestions in support of the motion (Doc. No. 74).

**I.     Background**

This is an action arising out of a franchise agreement between the parties in which plaintiff, Tri-State, had an agreement with defendant, John Deere, to sell and service John Deere products. Plaintiff brought a three-count petition alleging that (1) defendant wrongfully terminated plaintiff's franchise, (2) breached the contract between the parties, and (3) interfered with plaintiff's business expectancy.

Plaintiff is claiming damages for lost future profits. Plaintiff's expert, Nick Myers ("Myers"), a certified public account, provided an opinion relating to lost future profits/damages in this case. (See Report of Nick Myers, Doc. No. 41-2). Defendant previously objected to plaintiff's use of this expert in its motion to exclude plaintiff's expert opinion filed on May 24, 2007 (Doc. No. 40). However, the Court provisionally denied defendant's motion to exclude plaintiff's expert on July 24, 2007 (Doc. No. 61). While the

Court agreed with defendant that plaintiff's expert affidavit lacked the specificity required by the Scheduling Order and Rule 26, the Court gave plaintiff a second opportunity to supplement and correct its expert affidavit. Id. If plaintiff's amended expert affidavit still did not meet the Court's requirements, the Court stated in its Order that defendant may renew its motion to exclude plaintiff's expert. Id. Plaintiff subsequently amended its expert affidavit on August 3, 2007 (Doc. No. 64). Thereafter, defendant renewed its motion to exclude plaintiff's expert.

## II.   Standard of Review

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court interpreted the requirements of Federal Rule of Evidence 702 as they related to expert testimony. In United States v. Vesey, 338 F.3d 913, 916-17 (8th Cir. 2003), cert. denied, 540 U.S. 1202 (2004), the Court stated:

> Rule 702 requires the trial judge to act as a "gatekeeper," admitting expert testimony only if it is both relevant and reliable. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993). The trial court is granted broad discretion in its determination of reliability. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142, 119 S. Ct. 1167, 143 L. Ed.2d 238 (1999). The gatekeeper role should not, however, invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence, see Arkwright Mut. Ins. Co. V. Gwinner Oil Co., 125 F.3d 1176, 1183 (8th Cir. 1997). Expert testimony should be admitted if [1] it is based on sufficient facts, [2] it " is the product of reliable principles and methods," and [3] "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; see also General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed.2d 508 (1997).

Vesey, 338 F.3d at 916-17.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual

basis for the opinion in cross-examination." Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002)(quoting Bonner v. ISP Techs., Inc., 259 F.3d 924 (8th Cir. 2001)).  However, it is also true that if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded.  Id.

### III. Analysis

Under Fed. R. Civ. P. 26(a)(2)(B), a report disclosing expert testimony must contain:

> [A] complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Defendant seeks to exclude plaintiff's amended affidavit for the following reasons: (1) Myers' opinion will not assist the jury; (2) Myers' opinion lacks sufficient facts; (3) Myers' methodology is unreliable; and (4) Myers lacks the qualifications to support his opinion. In the alternative, defendant requests that it be granted an extension of time to designate its own expert in response. (See Myers' affidavit, Defendant's Exhibit A, Doc. No. 74-2).  The deadline for defendant to file its expert affidavit was May 30, 2007 and the deadline for rebuttal affidavits was July 2, 2007.  The Court will analyze defendant's arguments below.

#### A. Whether Plaintiff's Expert will Assist the Jury

Defendant first argues Myers' opinion will not assist the jury because he fails to identify the claim to which his report applies.  Defendant contends an opinion witness who cannot identify the claim to which his testimony applies or how it applies to plaintiff's claims will not assist the finder of fact.

3

Plaintiff did not respond to this issue.  Upon review of Myers' affidavit, the Court agrees that the report failed to identify to which of plaintiff's counts or claims his testimony applies.  There was simply no mention of any of plaintiff's claims in Myers' affidavit.

> **B.     Whether Plaintiff's Expert Affidavit Lacks Sufficient Facts**

Defendant claims that Myers' opinion rests only on three facts: 1) the termination provision of the dealership contract which includes automatic termination upon the death of the principal; 2) tax returns for the dealership for five years prior to termination; and 3) mortality tables.  Defendant argues that the remainder of the report is pure speculation.  For instance, defendant notes that the report states that Tri-State's business was "well-established." Defendant contends this statement ignores the irrefutable fact that at the time of termination of the dealership agreement, Tri-State was the worst performing Deere dealership for 150 miles in any direction.

Next, defendant argues the report wrongly assumes that Eric Wolfe, the shareholders' son, will one day assume ownership of the dealership.  Defendant argues this runs counters to the facts of this case because Charles and Judy Wolfe, Tri-State's shareholders, own 100% of Tri-State's shares. Defendant further states that Eric Wolfe has no legal or equitable ownership interest in the dealership and cannot automatically succeed to his parents' contract with John Deere.

Plaintiff responds that Tri-State's dealership was a well-established business. Plaintiff states that Charles Wolfe's father started the John Deere dealership in the 1940s and Charles and Judy Wolfe took over the dealership in 1964 or 1965.  Plaintiff notes that Myers reviewed Tri-State's most recent dealer agreement from 1985 with defendant when

4

he completed his report which demonstrates that Myers understood he was dealing with a business that had been operating for at least 20 years.

Further, plaintiff responds that for an established business, past sales establish future profits, not market share. Plaintiff notes that it is simply false that Tri-State was the worst performing Deere dealership for 150 miles in any direction. From the deposition of Deere's representative, plaintiff provided examples of other dealerships which were performing worse than Tri-State, but were not terminated: in 2002, Chanute, Kansas performed lower than plaintiff; in 2003, Joplin, Nixa, and Lockwood performed below plaintiff; and in 2004, the year Tri-State received the termination notice, Lockwood, St James, Freistatt, Carthage and Alton all performed below plaintiff and are still operating today. Plaintiff also argues that these facts go to the reasonableness of the termination and are issues for the jury to determine.

Lastly, plaintiff responds that Myers used the sales figures of Tri-State to calculate lost future profits because the market share number that defendant used lacks reliability. For example, plaintiff notes that while Tri-State's market share was 18.2% in 2002, sales were $1,632,583.00 that same year. Additionally, plaintiff states that in 2004, its market share was 14.9% in 2004, but its sales increased to $2,043,270.00. Thus, Myers used the past sales from the years in which defendant complained Tri-State's market share was low (2001-2004) to calculate average sales from the past in order to determine future lost profits. Plaintiff contends this method of using actual sales figures to calculate future profits is reasonable. In support of its argument, plaintiff cites to an Eighth Circuit case which holds that "[f]or established businesses, expected future profits may be extrapolated with reasonable certainty from historical evidence of the income and expenses of the business

5

prior to the damaging event." Wash Solutions, Inc. v. PDQ Manufacturing, 395 F.3d 888, 893 (8th Cir. 2005).

The Court finds that the issues presented by defendant's objections here go to the weight not the admissibility of Myers' affidavit. Hartley, 310 F.3d at 1061. The Court notes the issue of whether Tri-State was the worst performing dealer in the area is not a proper issue on a motion to exclude plaintiff's expert. Not surprisingly, the parties have different positions on the issue of whether Tri-State was performing well in its market. The Court concludes this issue go to the heart of plaintiff's wrongful termination claim and is for the jury's determination.

**C.** **Whether Plaintiff's Expert's Methodology is Unreliable**

Defendant states that in order to admit Myers' opinion and his theory of damages, this Court must consider the merits of his methodology. Defendant argues that Myers does not identify the "accepted standards and practices within the industry" that he mentions in his report. Defendant compares Myers' report to the one in Meterlogic, Inc. v. KLT, Inc., 368 F.3d 1017 (8th Cir. 2004), where the Eighth Circuit affirmed the trial court's exclusion of expert testimony based on a Daubert analysis. There Meterlogic, a seller of monitors and meters for copier machines, brought suit against KLT, its corporate partner, alleging that KLT made financial misrepresentations that proximately caused Meterlogic damage. Id. at 1018. Meterlogic's expert, Lawrence Redler, provided an opinion as to the damages claims regarding the present value of Meterlogic's business. Id. at 1019. The trial court excluded the testimony and the Eighth Circuit affirmed. Id. In Meterlogic, the Court held the expert's opinion was flawed because:

[1] [Redler] predicted financial results ten years into the future even though

6

the parties' contract extended only for two years and allowed for termination at any time; [2] he assumed that Meterlogic would be the sole representative of the appellees, even though the contract was a non-exclusive agreement; [3] he assumed that the parties would have 30% market share in the remote monitoring and metering market, but admitted that he had no market research to support that estimate; [4] he assumed 15% annual growth without any data indicating that the estimate was realistic; [5] he admitted to having no data on how many remote monitoring and metering devices would be sold; and [6] he admitted that he based his analysis on the so-called Metzler report, which was prepared for KLT only as investment-planning tool.

Id.

Defendant argues that Myers' report also contains the above weaknesses, which are the following:

1. Myers assumes that "extrapolation" of future profits from past performance yields accurate results. Defendants states that this analysis ignores the statistically relevant fact that Tri-State's market share was poor and dropping off: 18.2% in 2002, 23.1% in 2003 and 14.9% in 2004. Defendant also notes that Myers fails to analyze whether Tri-State's income could survive its worsening market share;
2. The report references no critical economic or accounting treatise. Defendant notes that Myers' conclusions are premised on his "extrapolation" of expected future profits from historical evidence of business income and expenses and that these numbers were pulled from National Vital Statistics Reports, Life Tables, and a Joplin Globe newspaper article from January 9, 2005. Defendant states that there is nothing to show how Myers arrived at his conclusions;
3. Myers' report assumes life expectancies rather than working life expectancies and attempts to superimpose shareholder's personal mortality tables onto lost corporate profits;
4. Myers predicts financial results more than 18 years into the future despite the fact that the agreement allows for "immediate cancellation for cause;"
5. Myers assumes that Tri-State's market share will remain static, despite statistical evidence to the contrary;
6. Myers provides no market research to support his unrealistic presumptions regarding future profits; and
7. Myers grounds his profit analysis on an unproven and untested method–extrapolating future profits from past performance.

Additionally, defendant states that under Fed. R. Evid. 702(3), plaintiff must show

7

that Myers "has applied the principles and methods reliably to the facts of the case." For example, defendant notes that Myers took gross sales figures and subtracted the costs of goods which resulted in a gross profit figure. Defendant states that Myers then added the gross profit to other income which created a total income figure. From the total income figure, he subtracted total deductions which equaled ordinary income. Once these calculations were completed, Myers examined the average compensation paid to Charles and Judy Wolfe, the average depreciation, the average amount of employee benefits program, and the average of other deductions. The average total deduction was then subtracted from the average gross profit which gives an average ordinary income of $22,745.00.

Defendant argues that this above analysis fails to take into account relevant facts. Myers' report states that Mr. Wolfe has a life expectancy of 11.40 years and should be fully compensated for each remaining year of his life. Defendant argues there is no factual support that individuals of Mr. Wolfe's age and health will work until they die. Defendant notes that Mr. Wolfe's deposition revealed that he takes seven medications for several health problems and he was hospitalized for several months in the summer of 2006. Defendant states Myers assumes Mr. Wolfe is capable of running the business now much less eleven years from now. Defendant also stated Myers assumed that Mrs. Wolfe could take over the business when she had only handled minor aspects of the business.

Plaintiff responds that life expectancy is a proper method to calculate lost profits. Plaintiff also distinguishes this case from Meterlogic, the case defendant cited to in support of its position that plaintiff's expert should be excluded as unreliable. Plaintiff states the expert in Meterlogic predicted financial results for ten years into the future even though the

8

contract was only for two years and could be canceled at any time. But plaintiff notes that defendant's dealer agreement does not allow defendant to cancel Tri-State's dealership except for limited reasons. Plaintiff further states in <u>Meterlogic</u>, the expert assumed a thirty percent market share but admitted he had no research to support his estimate, but plaintiff points out that Myers assumed no market share for Tri-State and simply used the previous sales history of a long standing business. The <u>Meterlogic</u> expert assumed a fifteen percent growth rate but had no basis for the growth rate. However, according to plaintiff, Myers assumed no growth rate and his calculations of past sales only take into account the years of which defendant complained of a low market share.

**D.     Whether Myers Lacks the Qualifications to Support his Opinion**

Defendant states that Myers' report fails to indicate key background information, such as his former and current employment and cites to no treatise for the methodology he uses to calculate Tri-State's damages. According to defendant, Tri-State has made no showing that Myers has ever estimated the future profits of a business, that he has studied how to measure the future profits of a business, or that he has been trained to do so.

Plaintiff responds its expert is qualified by education, experience, and has specialized knowledge to assist the jury. Lastly, plaintiff argues that doubts regarding "whether an expert's testimony would be useful should generally be resolved in favor of admissibility." <u>Clark v. Heidrick</u>, 150 F.3d 912, 915 (8th Cir. 1998)(quoting <u>Larabee v. MM&L Int'l Corp.</u>, 896 F.2d 1112, 1116, n. 6 (8th Cir. 1990)).

The Court concludes that Myers' expert affidavit is deficient in the following ways: (1) his damages calculation based upon Eric Wolfe's expectancy is overly speculative and assumes Eric Wolfe would take over the business after the death of Charles and Judy

9

Wolfe; (2) Myers' affidavit does not list adequate qualifications, such as current employment and his background in estimating future lost profits; and (3) Myers' affidavit does not specify which of plaintiff's claims his testimony would apply to at trial. The Court, however, must decide whether these deficiencies warrant exclusion of plaintiff's expert affidavit.

"The general rule under Missouri law is that anticipated profits of a commercial business are too remote and speculative to warrant recovery." Tipton v. Mill Creek Gravel, Inc., 373 F.3d 913, 917 (8th Cir. 2004)(holding that plaintiff did not prove lost profits with reasonable certainty because plaintiff's evidence was based upon speculation that there would be an increased demand for gravel in the area at some time in the future).[1] "Missouri Courts have consistently rejected projections when they are based upon assumptions or hopeful expectations." Tipton, 373 F.3d at 919, fn. 6; See also Gesellschaft Fur Geratebau v. GFG America Gas Detection, Ltd., 967 S.W.2d 144, 147 (Mo. Ct. App. 1998)(reversing the jury's judgment for lost profit damages because the plaintiff only offered "projections that were calculated on neither any actual sales nor revenue"); Brown v. McIBS, Inc., 722 S.W.2d 337, 341 (Mo. Ct. App. 1986) (rejecting lost profits and stating that "evidence of lost profits must be sufficiently definite and certain so as to allow a reasonably accurate estimate of the loss without resorting to speculation.")

However, anticipated profits can be recovered when they are "made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount."

---

[1] The Court further stated that "[p]rojecting $14 million in lost profits upon a future demand that does not yet exist is exactly the kind of conjectural assumption that is disfavored by all Missouri courts that have addressed the issue of lost profits." Tipton, 373 F.3d at 919.

10

Case 3:06-cv-05020-FJG   Document 123   Filed 12/06/07   Page 10 of 14

Coonis v. Rogers, 429 S.W.2d 709, 714 (Mo. 1968). "Speculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial." Tipton, 373 F.3d at 919 n. 6 (citing Ozark Employment Specialists, Inc. v. Beeman, 80 S.W.3d 882, 897 (Mo. Ct. App. 2002)). "For established businesses, expected future profits may be extrapolated with reasonable certainty from historical evidence of the income and expenses of the business prior to the damaging event." Wash, 395 F.3d at 893; See also Tipton, 373 F.3d at 918.

In Myers' affidavit, his report is based on the past sales and gross profits of Tri-State in previous years; the tax returns of Charles and Judy Wolfe, the deductions that would be taken from the sales, i.e. employee benefits program; and the benefits that Charles and Judy Wolfe would have received if defendant did not terminate plaintiff's dealership. (See Myers' affidavit, Defendant's Exhibit A, Doc. No. 74-2). Myers report only used the past sales from the years in which defendant complained Tri-State's market share was low, which was 2001-2004. Id. Myers then determined the duration of the loss based upon the life expectancy of Charles and Judy Wolfe and their son, Eric Wolfe, if he would have taken over the business. Id. Based on these calculations, Myers concluded that plaintiff is entitled to lost future profits of $65,315.00 as determined by historical evidence of income and expenses. Id. Further, Myers determined that "when based upon the life expectancy of Charles and Judy Wolfe, these damages total $744, 587 and $1,222, 384, respectively; and when based upon the life expectancy of Eric Wolfe, these damages total $2,416,655." Id.

The Court finds that plaintiff's expert affidavit should not be excluded as many of defendant's objections go to the weight of the testimony, not to its admissibility and it is up

11

to the opposing party to examine the factual basis for the opinion on cross-examination. Bonner v. ISP Techs. Inc., 259 F.3d 924, 929-30 (8th Cir. 2001)(quoting Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1996)). While calculations of anticipated lost profits cannot be speculative or too remote in order for plaintiff to recover such damages under Missouri law, the Court concludes that plaintiff's expert presented sufficient evidence as to Tri-State's history of sales and gross profits prior to the damaging event so as to assist the trier of fact. Regardless of whether Tri-State was the worst performing dealership in its market, Tri-State was an established business dating back to 1944 and the dealership agreement at issue went into effect in 1985; thus, Tri-State has historical income and evidence from which to prove lost profits. Additionally, the Court is not troubled by Myers' use of life expectancy tables as it has long been held that life expectancy tables are admissible in damage actions for the "consideration of the probabilities of damage over a period of years." Crane v. Crest Tankers, 47 F.3d 292, 295, fn. 4 (8th Cir. 1995) (quoting Continental Casualty Co. v. Jackson, 400 F.2d 285, 293 (8th Cir. 1968)) (internal quotations omitted). Again, Myers' failure to take into account work life expectancy goes to the weight of his testimony, not its admissibility.

However, the Court also finds that the portions of Myers' affidavit which speculates as to Tri-States damages if Eric Wolfe takes over the family dealership is overly speculative and will not assist the jury. Thus, the Court hereby orders that the portions of plaintiff's expert affidavit relating to Eric Wolfe be stricken. The Court further orders that plaintiff amend its expert affidavit with the following information by **Wednesday, December 12, 2007**: (1) specify which of plaintiff's claims Myers' testimony would apply to at trial and (2)

12

provide a more detailed description of Myers' current employment.

Additionally, defendant had requested a motion for extension of time to designate its own expert in response to plaintiff's expert if the Court denied defendant's motion to exclude plaintiff's expert. The deadline for rebuttal affidavits was July 2, 2007 according to the Court's Scheduling Order (Doc. No. 35). Defendant requests to file a rebuttal affidavit out of time. The Court had previously provisionally denied defendant's request for an extension of time to designate its own expert on July 24, 2007 (Doc. No. 61) on the basis that defendant could renew its motion to exclude plaintiff's expert should plaintiff's amended affidavit fail to meet the Court's Order. Because defendant had previously requested the Court to designate its own expert and plaintiff indicated no objections in its response, the Court hereby **GRANTS** defendant's motion for extension of time to designate its own expert. In addition, defendant's designation of its rebuttal expert should not interfere with the trial date in this matter scheduled for April 7, 2008. The Court further orders that defendant designate its expert by no later than **Thursday, January 10, 2008**. However, the Court hereby reminds the parties that paragraph 7(a)(2) of the Court's Scheduling Order (Doc. No. 35) states that "<u>any further discovery relative to the information and opinions reflected in the expert affidavits shall be by Court order</u>." While the Court will allow defendant to designate a rebuttal expert, this is not an opportunity for parties to conduct further discovery or depose any experts.

IV.    **Conclusion**

For the foregoing reasons, defendant's Motion to Exclude the Designation and Testimony of Plaintiff's Expert is **DENIED** (Doc. No. 40) and defendant's motion for

13

Extension of Time to Designate its Expert Witness (Doc. No. 40) is **GRANTED**. Defendant must designate its own expert by no later than **Thursday, January 10, 2008**. The Court further orders that the portions of plaintiff's expert affidavit relating to Eric Wolfe be stricken. In addition, the Court orders that plaintiff amend its expert affidavit with the following information by **Wednesday, December 12, 2007**: (1) specify which of plaintiff's claims Myers' testimony would apply to at trial and (2) provide a more detailed description of Myers' current employment. Failure of plaintiff to timely amend its expert affidavit may result in the Court striking the affidavit.

    **IT IS SO ORDERED.**


Date: 12/6/07  
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**  
Fernando J. Gaitan, Jr.  
Chief United States District Judge

14

Case 3:06-cv-05020-FJG   Document 123   Filed 12/06/07   Page 14 of 14